May it please the Court, my name is Joseph Bourne and I represent the Plaintiff Appellant Rachel Stover. This is an appeal of an order compelling arbitration where the defendant, Experian, argues both that its own consumer adhesion contract is not enforceable as written in its change-of-terms clause and that ambiguities in the agreement must be resolved in its favor and the carve-out of FCRA claims. There are three reasons that Ms. Stover's claim is not subject to arbitration under the 2018 Terms of Service. One, the grammatical structure of the arbitration clause carves out all claims arising out of or relating to the FCRA or Fair Credit Reporting Act. Two, the ordinary dictionary meanings of the terms consumer disclosure and consumer report should apply here, and three, a credit score is a type of consumer disclosure within the meaning of the Fair Credit Reporting Act. The grammatical question is whether the phrase relating to the information contained in your consumer disclosure or report modifies the Fair Credit Reporting Act, the other state or federal laws, or both in the phrase arising out of or relating to the Fair Credit Reporting Act or other state or federal laws relating to the information contained in your consumer disclosure or report. We submit that the most natural reading is that it modifies what immediately precedes it, other state or federal laws, which also comports with common sense because other state or federal laws would be limitless without a limitation to those relating to consumer disclosures or reports. On the other hand, the Fair Credit Reporting Act... Let me ask you this, Counsel, a consumer disclosure and consumer report are defined in the FRCA, are they not? No, Your Honor. Consumer report is defined in the FCRA. Consumer disclosure, in our view, is not defined. The district court relied on a provision in the Fair Credit Reporting Act which says that a credit score need not be disclosed and that falls within Section 1681G, which deals generally with consumer disclosures. However, Section 1681G and the rest of the statute at no point actually explicitly define the term consumer disclosure. And there also... So we would submit that a credit reporting agency, when it chooses to provide a credit score, then the credit score is a consumer disclosure and there's nothing in the Fair Credit Reporting Act that prohibits this reading of the statute. It also... But bottom line is, unlike, well, you concede that consumer report is defined, you say consumer disclosure is not defined, but in order to be successful in this aspect of your claim, we have to buy your reading of consumer disclosure, right? Your Honor, you either have to agree with our reading of consumer disclosure under the statute, under the Fair Credit Reporting Act, or you have to agree that because those are not defined terms, inexperienced terms of service, the ordinary dictionary definition of the terms should apply instead. Let's skip to a different part of this issue. As I understand it, your client terminated her agreement. She then visited the site in 2018, but was she ever notified of the changes made in the 2018 terms? Your Honor, there isn't a fulsome record of that point because there hasn't been any jurisdictional discovery, but I would say that the record that we do have, the allegations in the complaint are sufficient to raise at the very least inquiry notice because she agreed to the 2014 terms, which had a change of provision, a change of terms provision. But not the ones that she particularly relies on here, and I would ask you under Wyndham v. Barnes & Noble and Douglas v. U.S. District Court, since she was arguably not notified of these, isn't that fatal to her claim? Your Honor, in my view, the answer to that is no, because Experian drafted this contract and it included a change of terms provision, and because she had notice under the 2014 terms, which were a quick wrap agreement, then it can be inferred at the pleading stage that she had actual or constructive notice of the 2018 terms when she visited the website, which had a browse wrap agreement, which also had a change of terms. But with respect, counsel, again, correct me if I have the facts wrong. As I understand it, she quit, basically. She then independently goes back years later and visits the site. She doesn't resubscribe or anything. She just goes back to the site and doesn't know about these changes of terms. How does that result in a contract formation under Wyndham v. Douglas? Your Honor, I believe it results in a contract formation because she had notice at all times that the terms could change, and she was aware of that when she visited the website. Wait a minute. This woman's not a lawyer, right? That is correct, Your Honor. Are you telling me that when she was a member in 2014 and she carefully reviewed all the terms of experienced contracts? Your Honor, I can't answer that question because there has been no discovery, and there is no record. Well, she's your client. Did she tell you that she understood that terms might change? And so that's why she visited the site in 2018, and there is where she discovered the change. Is that what you want us to believe? I personally haven't spoken with her about that particular question. All we have at this point are the allegations and the complaint, which are she visited the website again in 2018. But you see my problem with Wyndham v. Douglas, do you not? Your Honor, I understand where you're going with that, and I would submit that the practical realities of the situation and the equities here where Experian is the party that drafted this illusion contract and now is the one seeking to be relieved from application of the contract against it as drafted is simply unfair. So your argument is that Wyndham v. Douglas and what they say about contract formation in this setting, we should ignore and just base it on our sense of the equities? No, Your Honor, and I was simply attempting to say that the equities are also a factor here. However, I believe under Wynn and the discussion of assent there that a browse-wrap contract can be enforceable against a consumer, and I would submit that that is particularly true because based on the evidence in the record at this point, she was placed on notice and bound by the 2014 terms, which were a click-wrap agreement, and the court can and should infer in her favor that she was aware of the change of terms clause. Counsel, it's entirely up to you, but do you want to save any time for rebuttal? You have a little less than two minutes. I would like to save the remainder of the time with Your Honor's permission. Very well. All right, so let's hear from Mr. Fetter then. I think you're… Yes, that was what I was trying to fix. Thank you, Your Honor. So, let me start, I guess, with where Your Honor left off and mentioned one other thing, which is that, as counsel says, there was no discovery, but we do know that she visited the website in 2018, on May 10, 2018, the day before the complaint was filed, and so we haven't had discovery as to whether that visit was, you know, with the intention of trying to trigger the new… So, I guess I didn't realize that. So, you're saying that the plaintiff did not visit the site in 2018 until one day before the complaint was filed? Yeah, that's correct. I think if you look at either page 17 of the excerpts of record, which is the lower court opinion, or page 13 of their brief, they say the date was May 10th that she visited, and then if you look at the complaint, the complaint is dated May 11th. So, that's… I don't say that. The complaint would have had to be drafted unless counsel was sitting right there when she visited the site. Right. So, that's… Yeah. So, that's at least my understanding of how it happened. And, you know, I think what Your Honor raises… I want to move to the 2018 version as well and discuss that, but just to add that, you know, certainly, if there was anything in the 2018 version that we wanted to enforce against her under… You know, basically, what you have here is something… The change provision sets up an opportunity for acceptance by conduct, so that if someone keeps using the services and so forth, that that's going to signify that they accept the new terms and they're free to not continue using and not accept the new terms. Here, where someone just, you know, made the one visit but didn't… After, you know, if she looked at the terms and didn't actually continue doing anything that would indicate acceptance, then it's hard to imagine that we would be able to enforce that contract. Your understanding is that the plaintiff contends that when she visited the site in 2018, that she did, in fact, look at the CARBAT portion of the contract? I'm not understanding. I don't think that's clear at all whether she did, but I think that, you know, ordinarily, if someone under those terms has the opportunity to do it and then would continue using the services, you would have an argument for acceptance by… But here, your argument is that she only visited the site once, did not continue to use the service. Right. Right. And, you know, the purpose appears to have been to file the lawsuit, not to use the service. To the extent that we're talking about equities, I don't think this is about equities, but if we are, I think that would figure in. That's also relevant, in a way, to the 2018 because the plaintiff's argument here is sort of how could she be expected to know that, you know, this reference to consumer reports and consumer disclosures is not the same thing as the credit score that she's suing over. But, of course, the whole premise of her suit is that she knows exactly what a credit score is supposed to be and is suing us for providing her with something that she says is not what a credit score is supposed to be. So the notion that she couldn't or wouldn't have known the credit scores are not the same thing as credit reports or disclosures really doesn't hold water. I think that it's also, you know, counsel talks about dictionary definition. I mean, as was noted, consumer reports are defined, consumer disclosures are not defined, but there's plenty of accepted meanings discussed in plenty of cases, including, I think, one of your own opinions. I believe your honor was on Shaw. And, you know, it's well understood what those things are. This is a provision trying to carve out something that doesn't have anything to do with the service provided here, which is selling people credit scores, credit monitoring, et cetera. It's carving out people who have lawsuits over their credit reports where they believe there are inaccuracies, and obviously there are a lot of FCRA, that's sort of the run-of-the-mill FCRA lawsuit. In any event, it's notable, though, that the plaintiff is not able to come up with a single example from anywhere, you know, whether a case, regulatory, colloquial, anywhere that could be a credit report or as consumer disclosure. The last thing I wanted to mention is that, you know, counsel brings up the notion that this is all drafted by the company, and so I think the suggestion is it ought to be construed against the company. I mean, our position is it's not at all ambiguous, but even if it were, I think even if you look at the plaintiff's own case law, in the arbitration context, of course, the rule is that ambiguities are construed in favor of, scope of an agreement, that is, are construed in favor of something being within the scope of arbitration. The case that I'm thinking about in particular in their brief is Sanquist on page 27, which is a California Supreme Court case saying where the allocation of a matter of arbitration or the courts is uncertain, we resolve all doubts in favor of arbitration. That is, it's 1 Cal 5th at 247. But, you know, that's also citing, there's, you know, reams of federal case law. The one that the California Supreme Court cites there is Mastro Buono, but there's a lot of cases saying that, you know, where the scope of the arbitration agreement is in doubt, you're going to construe it in favor of arbitration. If there are no further questions, I'll rest on our briefs. Do either of my colleagues have questions, additional questions for Mr. Fetter? Thank you. I think not, Mr. Fetter. So, Mr. Boren, you have some rebuttal time. Thank you, Your Honor. Mr. Fetter made note that there's case law regarding a change of terms provisions which allow change by conduct, the implication being because she bought this score in 2014 and then no longer had contractual dealings with Experian, that that's determinative of this issue of the enforceability of the change of terms. And we would submit that the case law does not stand for that proposition and that, in fact, continuing conduct is not really the issue. The issue in the case is cited by the parties. Counsel, can I ask you a quick question since we just went over this briefly? Have you been Ms. Dover's counsel in this matter for the entire proceeding? No, Your Honor. I don't believe I was on the original complaint and I joined the action when I joined my current firm after that. Okay. The reason I ask that is, to your knowledge, was the complaint drafted or partially drafted before Ms. Dover made contact with Experian in 2018? I can't answer that question. I don't have any knowledge about it. So, I'm sorry, Your Honor. Do you understand our concern that the contract was filed one day after she went to the site? It's a rather lengthy complaint, is it not? I don't know if I would call it lengthy compared to many complaints that my firm files in the antitrust area. But I understand the point that you're making. I just don't have any factual information about it. However, I would submit that it's legally irrelevant and that the legal question is whether Experian should be held to the contract since it is self-drafted. I understand. I think you're out of time now. Do either of my colleagues have any questions for Mr. Bourne? No. I think not. Thank you, gentlemen, both, for your argument in this case. The case of Stover v. Experian Holdings is submitted.
judges: M. Smith, Owens, Cardone